APRIL M. STRAUSS, SBN: 163327
**APRIL M. STRAUSS, A PC**
100 S Murphy Ave
Ste 200, PMB4006
Sunnyvale, CA 94086-6118
Phone: (408) 212-0023
Email: astrauss@sfaclp.com

BEN BARNOW (*pro hac vice forthcoming*)
b.barnow@barnowlaw.com
**BARNOW AND ASSOCIATES, P.C.**
205 W. Randolph Street, Suite 1630
Chicago, IL 60606
Telephone: (312) 621-2000

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANN WASSERMAN, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CALIFORNIA PHYSICIANS' SERVICE d/b/a BLUE SHIELD OF CALIFORNIA, | |
| Defendant. | |

Plaintiff Ann Wasserman ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through the undersigned attorneys, brings this Class Action Complaint against Defendant California Physicians' Service d/b/a Blue Shield of California ("BSC" or "Defendant"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters as follows.

## <u>INTRODUCTION</u>

1.     Plaintiff brings this class action against Defendant for its failure to secure and safeguard Plaintiff's and Class members' personally identifiable information ("PII") and personal health information ("PHI"), including names, Social Security numbers, dates of birth, and insurance policy and claims information.

2.     BSC is a nonprofit health plan and health insurance provider. BSC contracts with and receives software or related services from Young Consulting, LLC ("Young

Consulting"), a developer of software for the marketing, underwriting, and administering of medical stop loss insurance.

3.     Between approximately April 10, 2024 and April 13, 2024, an unauthorized individual or individuals accessed Young Consulting's network systems and downloaded files containing the PII/PHI of BSC's customers, including Plaintiff and Class members (the "Data Breach").

4.     BSC promised Plaintiff and Class members that it, or the third parties it contracts and shares PII/PHI with, would implement and maintain reasonable and adequate security measures to secure, protect, and safeguard Plaintiff's and Class members' PII/PHI against unauthorized access and disclosure. BSC breached those promises by, *inter alia*, failing to, or sharing its customers' PII/PHI with third parties who failed to, implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure

5.     As a result of BSC's inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed as a result of the Data Breach.

6.     Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

*Plaintiff Ann Wasserman*

7.     Plaintiff is a citizen and resident of Illinois.

8.     Plaintiff received health insurance services from BSC. As a condition of providing such services to Plaintiff, BSC required Plaintiff to provide it with her PII/PHI.

9.    BSC shared Plaintiff's PII/PHI with Young Consulting in connection with BSC's receipt of services from Young Consulting.

10.    Based on representations made by BSC, Plaintiff believed BSC had implemented and maintained reasonable security and practices to protect her PII/PHI. With this belief in mind, Plaintiff provided her PII/PHI to BSC in exchange for receiving health insurance services from BSC.

11.    In connection with providing services to Plaintiff, BSC and Young Consulting collected, stored, shared, and maintained Plaintiff's PII/PHI on its systems, including the systems involved in the Data Breach.

12.    Plaintiff takes great care to protect her PII/PHI. Had Plaintiff known that BSC does not adequately protect the PII/PHI in its possession, she would not have obtained health insurance services from BSC or agreed to entrust it with her PII/PHI.

13.    Plaintiff received a letter from Young Consulting notifying her that her PII/PHI was exposed in the Data Breach.

14.    As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; deprivation of the value of her PII/PHI; lost time and money mitigating the effects of the Data Breach; and overpayment for services that did not include adequate data security.

***Defendant California Physicians' Service d/b/a Blue Shield of California***

15.    Defendant California Physicians' Service d/b/a Blue Shield of California is a California nonprofit corporation with its headquarters located at 601 12th Street, Oakland, CA 94607. It may be served through its registered agent: Cogency Global, Inc., 1325 J St., Suite 1550, Sacramento, CA 95814.

## JURISDICTION AND VENUE

16.    The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and

(c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs. Further, greater than two-thirds of the Class Members reside in states other than the states in which Defendant is a citizen.

17.    The Court has personal jurisdiction over Defendant BSC because it has its principal place of business in California and transacts significant business in California.

18.    Venue properly lies in this District because, *inter alia*, Defendant BSC's principal place of business is located in this District, Defendant transacts substantial business in this District, and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of BSC*

19.    BSC is a California health plan and health insurance provider.[1] BSC contracts for and receives software products or services from Young Consulting.

20.    Young Consulting is a developer of integrated software solutions for the marketing, underwriting, and administering of medical stop loss insurance for carriers, brokers and third-party administrators.[2]

21.    In the regular course of its business, BSC collects and collects, maintains, and shares the PII/PHI of its current and former customers.

22.    BSC required Plaintiff and Class members to provide it with their PII/PHI as a condition of receiving health insurance services. BSC in turn shared Plaintiff's and Class members' PII/PHI with Young Consulting in connection with using Young Consulting's software or services.

23.    BSC represents to its customers that it is "dedicated to providing an exceptional and secure digital experience by being a trusted and innovative healthcare

---

[1] *See About Blue Shield*, BLUE SHIELD CAL., https://www.blueshieldca.com/en/home/about-blue-shield (last accessed Dec. 20, 2024).
[2] *Young Consulting*, YOUNG CONSULTING, https://www.youngconsulting.com/ (last accessed Dec. 20, 2024).

CLASS ACTION COMPLAINT

company."[3] BSC promises it "complies with Health Insurance Portability and Accountability Act of 1996 (HIPAA) by implementing controls that safeguard data and satisfies HIPAA's Security Rule."[4]

24.    BSC tells its customers that it is "actively committed to protecting your personal health information by adhering to & applying industry best practices to ensure your data is safe."[5] It further states it is "actively committed to safeguarding member's personal information under federal and state laws."[6]

25.    It further states it applies "layers of security following leading industry cybersecurity standards . . . in our day-to-day operations to meet our regulatory and contractual security obligations."[7]

26.    BSC's website contains a Notice of Privacy Practices (the "Privacy Policy") that describes how PII/PHI of BSC's customers "may be used and disclosed."[8] BSC states that whenever it uses or discloses PII/PHI, it is "bound by the terms of this notice, which applies to all records that we create, obtain, and/or maintain that contain your PHI."[9]

27.    In the Privacy Policy, BSC states, "At Blue Shield, we understand the importance of keeping your personal information private, and we take our obligation to do so very seriously."[10] BSC also admits it is "required to maintain the privacy of your PHI and to notify you in the event that you are affected by a breach of unsecured PHI."[11]

28.    BSC promises that it "maintain[s] physical, technical, and administrative safeguards to ensure the privacy of your PHI."[12]

---

[3] *Trust Center*, BLUE SHIELD CAL., https://www.blueshieldca.com/en/home/about-blue-shield/privacy-and-security/trust-center (last accessed Dec. 20, 2024).
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] *Notice of Privacy Practices*, BLUE SHIELD CAL. (Aug. 16, 2013), https://www.blueshieldca.com/content/dam/bsca/en/member/docs/2024/C18305-0923-REF1520344-SECURE.pdf [hereinafter, the "*Privacy Policy*"].
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

CLASS ACTION COMPLAINT

29.    The Privacy Policy lists the ways BSC may use or disclose its customers' PII/PHI without their written authorization, including for treatment, payment, and operational purposes.[13] The Privacy Policy goes on to explain BSC will not use or disclose its customers PII/PHI for any other reason without written authorization.[14]

30.    Plaintiff and Class members are current or former customers of BSC whose PII/PHI was shared with Young Consulting.

### The Data Breach

31.    Between approximately April 10, 2024, and April 13, 2024, "an unauthorized actor gained access to Young Consulting's network . . . and downloaded copies of certain files."[15] These files contained the PII/PHI of Plaintiff and Class members, including "names, Social Security number, date of birth, and insurance policy/claim information."[16] On or about June 28, 2024, Young Consulting provided confirmation of the Data Breach to BSC.[17]

32.    While Young Consulting discovered the Data Breach on or about April 13, 2024, and notified BSC of the Data Breach on or about June 28, 2024, BSC waited until August 26, 2024, over four months after initially discovering the Data Breach, to begin notifying Plaintiff and Class members that their PII/PHI was in the hands of cybercriminals.[18]

33.    BSC's failure to promptly notify Plaintiff and Class members that their PII/PHI was accessed and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive

---

[13] *Id.*

[14] *Id.*

[15] *Notice of Data Privacy Event*, YOUNG CONSULTING, https://youngconsulting.com/notice/youngconsulting-notice.html (last accessed Dec. 20, 2024) [hereinafter, "*Website Notice*"].

[16] *Id.*

[17] *Id.*

[18] *See Data Breach Notification*, OFF. OF THE ME. ATT'Y GEN. (Aug. 26, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9cb5e8fe-3d04-48e5-a403-d478cdaf5c7f.html.

information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their PII/PHI will be misused and their identities will be (or already have been) stolen and misappropriated.

### BSC Knew that Criminals Target PII/PHI

34.    At all relevant times, BSC knew, or should have known, that the PII/PHI it collects, shares, and maintains was a target for malicious actors. Indeed, BSC's Privacy Policy states its customers have the right to be notified in the event of a data breach.[19] Despite such knowledge, BSC failed to, or contracted with third parties that failed to, implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized access that BSC should have anticipated and guarded against.

35.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[20]

36.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2024 report, the healthcare compliance company Protenus found that there were 1,161 medical data breaches in 2023 with over 171 million patient records exposed.[21] This is an increase from the 1,138 medical data breaches which exposed approximately 59 million records that Protenus compiled in 2023.[22]

---

[19] *Privacy Policy*, *supra* note 8.
[20] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.
[21] *See 2024 Breach Barometer*, PROTENUS 2, https://protenus.com/hubfs/Breach_Barometer/Latest%20Version/Protenus%20-%20Industry%20Report%20-%20Privacy%20-%20Breach%20Barometer%20-%202024.pdf (last accessed Dec. 20, 2024).
[22] *See id.*

CLASS ACTION COMPLAINT

37.     PII/PHI is a valuable property right.[23] The value of PII/PHI as a commodity is measurable.[24] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[25] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[26] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

38.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security Numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

39.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[27] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[28]

---

[23] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[24] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[25] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[26] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[27] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[28] *Id.*

CLASS ACTION COMPLAINT

40.    All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[29] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[30]

41.    Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[31] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[32]

42.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[33]

43.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[29] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[30] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[31] Steager, *supra* note 27.
[32] *Id.*
[33] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

CLASS ACTION COMPLAINT

*Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

44.    Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[34][35]

45.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[36]

46.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[37]

47.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[38] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[39] In

---

[34] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Dec. 20, 2024).
[35] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).
[36] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.
[37] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Dec. 20, 2024).
[38] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[39] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 30.

warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [40] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use." [41]

48.   A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a.   Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b.   Significant bills for medical goods and services neither sought nor received.

c.   Issues with insurance, co-pays, and insurance caps.

d.   Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e.   Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f.   As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g.   Phantom medical debt collection based on medical billing or other identity information.

---

[40] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Dec. 20, 2024).
[41] *Id.*

CLASS ACTION COMPLAINT

h.   Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[42]

49.   There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[43]

50.   It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiff and the Other Class Members*

51.   Plaintiff and all other Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in BSC's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for services that were received without adequate data security.

## CLASS ALLEGATIONS

52.   This action is brought and may be properly maintained as a class action pursuant to Federal Rule of Civil Procedure 23.

---

[42] *See* Dixon & Emerson, *supra* note 38.
[43] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

53.    Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons whose PII/PHI was provided to BSC and was accessed in the Data Breach by unauthorized persons, including all such persons who were sent a notice of the Data Breach.

54.    Excluded from the Class are California Physicians' Service d/b/a Blue Shield of California, and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge(s).

55.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

56.    The members in the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. Young Consulting reported to the Office of the Maine Attorney General that the Data Breach affected 954,177 persons.[44]

57.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.  whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b.  whether Defendant had duties not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c.  whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d.  whether an implied contract existed between Class members and BSC, providing that BSC would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e.  whether Defendant breached its duties to protect Plaintiff's and Class members' PII/PHI; and

---

[44] *Data Breach Notification*, *supra* note 18.

CLASS ACTION COMPLAINT

f.  Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

58.  BSC engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison in both quantity and quality to the numerous common questions that dominate this action.

59.  Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

60.  Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature. Plaintiff has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff and her counsel have adequate resources to assure the interests of the Class will be adequately represented.

61.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and all other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer

CLASS ACTION COMPLAINT

management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

62.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

63.     BSC owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting the PII/PHI it collects, stores, maintains, and shares. This includes a duty to ensure that any third parties it shares PII/PHI with maintain reasonable and adequate data security practices.

64.     BSC knew, or should have known, the risks of collecting, storing, and sharing Plaintiff's and Class members' PII/PHI, and the importance of maintaining secure systems. BSC knew, or should have known, of the many data breaches that targeted companies storing PII/PHI in recent years.

65.     Given the nature of BSC's business, the sensitivity and value of the PII/PHI it collects, maintains, and shares, and the resources at its disposal, BSC should have identified the vulnerabilities in its systems or the systems of third parties it shares PII/PHI with and prevented the Data Breach from occurring.

66.     BSC breached these duties by failing to, or contracting with companies that failed to, exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

67.     It was, or should have been, reasonably foreseeable to BSC that its failure to, or contracting with companies that failed to, exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt,

1
2
3
4

implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

5
6

68.    But for BSC's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

7
8
9
10
11
12
13
14
15
16
17
18

69.    As a result of BSC's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members have suffered and will continue to suffer injury including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in BSC's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

19
20

**COUNT II**
**NEGLIGENCE PER SE**

21

70.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

22
23
24
25
26

71.    BSC's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

27
28

72.    BSC's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as BSC, of failing to employ reasonable measures to protect and secure PII/PHI.

73.    BSC violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to, or contract and sharing PII/PHI with third parties who failed to, use reasonable measures to protect Plaintiff's and other Class members' PII/PHI and by not complying with applicable industry standards. BSC's conduct was particularly unreasonable given the nature and amount of PII/PHI its obtains, shares, and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members

74.    BSC's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

75.    Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

76.    The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, like BSC, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

77.    It was, or should have been, reasonably foreseeable to BSC that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

78.    The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of BSC's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in BSC's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF IMPLIED CONTRACT

79.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80.    In connection with receiving health insurance services, Plaintiff and Class members entered into implied contracts with BSC.

81.    Pursuant to these implied contracts, Plaintiff and Class members paid money to BSC and provided BSC with their PII/PHI. In exchange, BSC agreed to, among other things, and Plaintiff and Class members and BSC mutually understood that BSC would: (1) provide health insurance services to Plaintiff and Class members; (2) collect, store, and use Plaintiff's and Class members' PII/PHI to facilitate providing health insurance services to Plaintiff and Class members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (4) protect Plaintiff's and Class members PII/PHI in compliance with federal and state laws and regulations, industry standards, and BSC's representations regarding their security and privacy practices.

82.     The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and BSC, on the other hand. Had Plaintiff and Class members known that BSC would not adequately protect its current and former customers' PII/PHI, including by sharing their PII/PHI with third parties who do not adequately protect PII/PHI in their possession, they would not have sought health insurance services from BSC. The materiality of the protection of PII/PHI is demonstrated by BSC's representations and promises made to Plaintiff and Class members regarding its data security and privacy practices, as described herein.

83.     Plaintiff and Class members performed their obligations under the implied contract when they provided BSC with their PII/PHI and paid for health insurance services from BSC.

84.     BSC breached its obligations under the implied contracts with Plaintiff and Class members in failing to, and sharing PII/PHI with companies that failed to, implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to, or sharing PII/PHI with companies that failed to, implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, industry standards, and BSC's representations.

85.     BSC's breach of its obligations of the implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

86.     Plaintiff and all other Class members were damaged by BSC's breach of implied contracts because: (i) they paid for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international

- 19 -

market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

**COUNT IV**
**UNJUST ENRICHMENT**

87.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88.     This claim is pleaded in the alternative to the breach of implied contract claim.

89.     Plaintiff and Class members conferred a monetary benefit upon BSC in the form of monies paid to BSC for health insurance services, which BSC in turn used to pay for Young Consulting's services, and through the provision of their PII/PHI.

90.     BSC accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class Members. BSC also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate payment and their business operations.

91.     As a result of BSC's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

92.     BSC should not be permitted to retain the money belonging to Plaintiff and Class members because BSC failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

93.     BSC should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

CLASS ACTION COMPLAINT

1

## **PRAYER FOR RELIEF**

2        Plaintiff, individually and on behalf of all other members of the Class, respectfully

3   requests that the Court enter judgment in her favor and against Defendant as follows:

4        A.     Certifying the Class as requested herein, designating Plaintiff as Class

5   Representative, and appointing Plaintiff's counsel as Class Counsel;

6        B.     Awarding Plaintiff and the Class appropriate monetary relief, including

7   actual damages, statutory damages, punitive damages, restitution, and disgorgement;

8        C.     Awarding Plaintiff and the Class equitable, injunctive, and declaratory

9   relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks

10  appropriate injunctive relief designed to prevent Defendant from experiencing

11  another data breach by adopting and implementing best data security practices to

12  safeguard PII/PHI and to provide or extend credit monitoring services and similar

13  services to protect against all types of identity theft;

14       D.     Awarding Plaintiff and the Class pre-judgment and post-judgment

15  interest to the maximum extent allowable;

16       E.     Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and

17  expenses, as allowable; and

18       F.     Awarding Plaintiff and the Class such other favorable relief as allowable

19  under law.

20

21

## **JURY TRIAL DEMANDED**

22       Plaintiff demands a trial by jury of all claims in this Class Action Complaint

23  so triable.

24

 Dated: December 20, 2024              Respectfully submitted,

25

26                                      /s/ *April M. Strauss*
                                        April M. Strauss, SBN: 163327
                                        **April M. Strauss, A PC**
27                                      100 S Murphy Ave
                                        Ste 200, PMB4006
28                                      Sunnyvale, CA 94086-6118

Phone: (408) 212-0023
Email: astrauss@sfaclp.com

Ben Barnow*
BARNOW AND ASSOCIATES, P.C.
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com

*Attorneys for Plaintiff and the Proposed
Class*

*Pro hac vice* forthcoming

CLASS ACTION COMPLAINT